Case No. 18-1248, NL City of Oberlin, Ohio Petitioner v. Federal Energy Regulatory Commission Ms. Elahant, Petitioners Ms. Banta, Respondent Mr. Super, for the entry Ms. Elahant, Petitioner Good morning. May it please the Court, Carolyn Elahant for Petitioner, the City of Oberlin, and with me at Council Tables, David Mucklau and Aaron Reinbaugh, Council for the Coalition to Reroute Nexus. Your Honors, the City's municipal property and the Coalition members' private property was taken in eminent domain by a pipeline that will transport gas across the boundaries to Canada and in so doing also pushes the boundaries of this circuit's precedent. This circuit has held repeatedly, and most recently in Appalachian Voices v. FERC, that a pipeline that is 100% subscribed by long-term contracts will satisfy the need requirement of Section 7. Yet here, the Commission approved a pipeline that is only 59% subscribed and of that 59%, a scant 22% is known to be going for domestic use. This Court has held in Border Pipeline and its progeny that foreign commerce and interstate commerce are two entirely different animals covered by two separate provisions of the Natural Gas Act, Section 7 for interstate commerce, Section 3 for foreign commerce. Yet here, the Commission relied almost entirely on a showing of need by gas that's going for export. And finally, in most of these cases that this Court hears on review of FERC proceedings, they're subject to the Garden Variety Deferential Administrative Procedure Act standing. This case implicates constitutional rights and as a result, when this Court reviews the constitutional claims that the petitioners have raised, a de novo standard applies. I want to discuss first the issue of the lack of need for this pipeline and what sets it apart from, again, many of the cases that this Court has affirmed Commission certificates. Here, this pipeline, at best case, was 59% subscribed. Of the 1.5 million decatherms a day capacity for this pipeline, only 200,000 of that, that's only 13%, is known to go for domestic use. Were it not for those exports and that other capacity, this pipeline would never have been approved under the Commission's own certificate policy statement. How do you get the 200,000 number? Because I thought that it was only, I think, 260,000 that is contracted to go to Canada. Yes, there's the 260, and in Nexus's brief at page 22, it also acknowledges that there's 200,000 by one of the suppliers, Chesapeake, which will also be going to Canada. The Commission, when the Commission examined the different numbers, it had said that there was the 200 for domestic, the 260, the Commission itself acknowledged the 260 for export, and the Commission said it wasn't sure where the other gas was going. Like I said, Nexus has already acknowledged that of that, 200 by Chesapeake is going to be for export. That does leave 225,000 unaccountable. The Commission's failure to make a finding on where the gas is going hampers its findings on need under Section 7. The Commission at least needed to address where the gas was going and to say, well, we don't know if it's being used for domestic supply or for export, isn't sufficient for it to meet its burden of substantial evidence in terms of approving a pipeline under Section 7. There's got to be gas in interstate commerce. As we argued, and even again, even if we include the other 400, the sort of unaccounted for gas, that gives us 600 decatherms a day of that entire 1.5 million decatherms. That still would not, if you're just looking at that 600, that still would not sustain a finding of need under Section 7 applying the Commission Certificate Policy Statement. The Commission Certificate Policy Statement says that if you have precedent agreements that fully back a project, that will support a Section 7 finding, and this Court has affirmed that multiple times, but this wasn't that case. The Commission is trying to shoehorn these facts, a partially subscribed pipeline, into precedent that applies to fully subscribed. But the Certificate Policy doesn't require 100 percent subscription, right? Yes, that's correct, Your Honor. It doesn't require, what the Certificate Policy Statement says, and as we argued in our reply brief in our brief, is that if you have, if most of the capacity is under a precedent agreement, that will support a finding of need. If you don't have most of the capacity under a precedent agreement, you can look to other factors. I'm sorry, so why isn't 59 percent most? So while FERC itself stated in its order that a substantial portion of the capacity was unsubscribed, and that's in the Joint Appendix at page JA-1051, where FERC admits that a significant part of capacity is unsubscribed. It then tries to backpedal in its brief and claim that the 59 percent is substantial, but that was its finding in its order, and it can't backpedal from that. So it seems like there's two layers. If we're going to avoid, as you provocatively said at the beginning of your argument, pushing the boundaries of our cases and the boundaries of the country, if there's the 59 percent layer that has to do with allocation period, and then there's some fraction of that that has to do with allocation that is predictably going abroad. So are you saying that 59 percent, regardless of what happens below that, in terms of what goes to Canada, is just not enough, period? Or are you saying 59 percent is problematic because when you factor in the share of that that's going to go to Canada, it becomes problematic, although 59 percent in and of itself wouldn't necessarily be if, for example, all of that was predictably allocated domestically? That's a good question because our argument, in fact, has evolved. We would say that 59 percent, even assuming all of the 59 percent is for domestic use, there's no question about it. We would argue that that still falls short of FERC certificate policy statement because there's a significant amount that's unsubscribed and because there isn't sufficient proof that there is a future need, and that was the point that Commissioner Glick made in his dissent. He said that because the pipeline is undersubscribed, and he didn't look at this export versus domestic. He just looked at it straight up, and he said because there's only 59 percent that's subscribed, then we need to look at future use, and he criticized the majority in this decision for cherry-picking the evidence and picking the evidence that favored their showing of need while ignoring other evidence, such as market studies showing that there was a need that was declining. So we think that the 59 percent as it stands is problematic, and under these facts, even if it were all domestic, wouldn't sustain a finding of need. However, that 59 percent becomes even more vulnerable when you start to look at the amount of that gas, that 59 percent that's going towards export, and that would be our second argument, is that the 59 percent, if this Court were inclined to view 59 percent as adequate, it must then evaluate what portions of that 59 percent can actually be used to sustain the Section 7 findings. And what's your principle on the latter? At what point does it become problematic that some of the natural gas is going, at least initially, going to go abroad? Well, what the Court would have to look at is taking out the amount of export, whether this would be a pipeline that would stand on its own, and by our calculations, again, it would either be, you know, could this pipeline stand on its own without those exports, and we know, again, there's 200, we know that at a minimum, the floor is 200,000, which is only 11 percent of the 1.5 million. That, I think even the Commission itself would concede that that would not satisfy the public need. When you add in the 400, you get up to like 22 percent or 30 percent, and again, it wouldn't pass, in our view, would not pass muster under the Certificate Policy Statement. It's also something that the Commission, it's an argument that the Commission hasn't addressed. We can't speak for the Commission. This is a case of first impression, and there haven't been pipelines that have come before the Commission or this Court that seek approval of a Section 7 certificate based on such a stant amount of domestic use, so it would at least be, at a minimum, something the Commission would have to explain. So your position is not that once we know that some of the natural gas, or once we can reliably predict that some of the natural gas is going to go, say, to Canada, that that in and of itself is a stop. It's that when you take that into account, plus the fact that you have 59 percent committed, then you just don't have enough committed. Yes, yes, and to sort of close out the argument, the kicker is really the eminent domain, because Section 3 does not authorize eminent domain, and Section 7 of the Natural Gas Act does authorize eminent domain, and so when you boost your numbers with export, FERC is really doing indirectly that which it cannot do directly, which is to authorize a certificate that will convey the power of eminent domain to a pipeline that is being used largely for export. If there are no other questions, I reserve some time for rebuttal. Thank you. Counsel for Respondent? Yes. Good morning. Carol Danza for the Commission. I'll begin with the Certificate Policy Statement and the analysis in this case. In the Certificate Policy Statement, specifically on page 61749 of that, the Commission had said that the balancing of the benefits versus the residual adverse effects is a sliding scale approach, and it talks about how a pipeline, basically the showing of the subscribed capacity or the other evidence of need and public benefit would need to be higher to outweigh significant exercises of eminent domain. So if we look at the certificate order in this case, paragraph 49, really the analysis in, it begins in 41, but the key part I'm looking at is 49, which is at JA1054. It begins in 41 by saying we have a sufficient demonstration of need, but the key in section 49 is the last two, or paragraph 49, is the last two sentences. In this case, the pipeline came in with 93 percent of the pipeline route being obtained without the use of eminent domain. Forty-five percent is co-located on existing rights of way, railroad, electric transmission, things like that. Forty-two percent agricultural use, and I don't know how the agricultural part breaks down, but they came in with 93 percent already obtained without needing any exercise of eminent domain, and what the commission is saying in paragraph 49 is that's very high. That is such a large portion that has been acquired without the use of eminent domain. It strongly supports a finding that the applicant's efforts have minimized the potential for adverse impacts on landowners. So the commission not only found that 59 percent was a showing of need, it's not as high as some cases, but the commission pointed to the fact that the percentage of the pipeline route that wouldn't need eminent domain at all was unusually large. So in the sliding scale approach, the way the commission applies the policy statement, you may not need 100 percent or close to 100 percent contracts to outweigh a very small use of eminent domain. I don't understand where that gets you, though, because even if it's 1 percent of eminent domain that's needed, that's someone's property that's being taken, and that raises constitutional issues. It does. So even if that's 0.1 percent of the project, ultimately that's someone's property that's constitutionally protected. So I don't understand what you're doing with this argument. Well, in making the finding of public convenience and necessity, the commission has always applied the sliding scale. Yes, to that 7 percent, it is significant. But the commission, I mean, those aren't the only findings the commission made. The commission went through a great deal of detail about why downsizing the pipeline wouldn't change the route, making it smaller wouldn't change the route. Other pipelines could not serve this market need that was shown by these contracts. So in the context of pipeline cases, there are often more substantial exercises of eminent domain. And in this context, 93 percent obtained without it was quite high. As for the constitutional question, I mean, the commission cited the other cases, such as Transco and Mountain Valley, which was affirmed in Appalachian Voices, that the finding of public convenience and necessity under 7E, under 15 USC 717FE, is sufficient for the exercise of eminent domain in Section 7H, or 717FH. And Appalachian Voices and Midcoast have upheld that. The statute doesn't require it. The finding of public convenience and necessity is a finding of public use, because of the cases going back some years that pipelines are a form of public utility. So that is how the commission got from 59 percent, which in a case that required more eminent domain, like I said, 93 percent is unusually high to obtain without it. It was 59 percent, but then the commission also, I think, said that 59 percent was expected to grow over time. It was. And it also looked at the fact, if the commission directed the pipeline to build a smaller pipeline so that it didn't have as much unsubscribed capacity, it did the analysis and found that it wouldn't change the route. It wouldn't have any more effect on the residual adverse impacts of the pipeline. So you have these 885,000 dekatherms per day of shown market need through precedent agreements, and they can't be served by other pipelines in the area. There aren't that many other pipelines in the area, which is one of the benefits that the commission found in addition to the market need. It found bringing infrastructure, pipeline infrastructure, and diverse supplies into the region, giving more access to some of the eastern gas into a region that has in the past, I think, imported most of its gas from Canada. So bringing a diversity of supplies, bringing more infrastructure, increasing the reliability of the overall pipeline grid. The commission looked at all of that in these orders and said that, as I said, downsizing the pipeline wouldn't reduce where the route needs to go, and the other pipelines couldn't serve that. Even if they had the capacity, they would require hundreds of miles of laterals to serve it. To what extent can the commission use precedent agreements that are clearly for export to justify project need under Section 7? Be consistent with border pipeline. Well, I think the commission said in paragraph 45 of the rehearing order on J1228, it rejected the assumption that much of this gas was not for domestic consumption. There is the, I think, 260,000 up to. That doesn't mean 260,000 would be flowing at any given time, but up to 260,000 decatherms per day for the two local distribution companies in Canada. But as to the rest, besides the deliveries we know are going to domestic local distribution companies and one electric utility, the commission rejected the assumption that the gas producers got the option to send gas all the way to Canada. But they don't have to. They have access to delivery. You're talking about the 260,000 decatherms. Let's focus on that. Well, we know about the 260,000, right. So why is it appropriate to consider that? I think that the commission, it doesn't break it down like that because it is looking at other benefits to the pipeline like the infrastructure. Why shouldn't we send it back? Because they didn't look at that. It didn't give us an explanation about why it was appropriate to consider that. Because I think with the producers and the domestic, I think given the unusually high amount of, as I said, the sliding scale approach, I think the commission found that to be enough. Now, in town of Weymouth, this court said that just because some gas is being exported, in that case it was 52% of the capacity was, they said, slated for export. And in that case, it was much more certain. The construct of that pipeline, it was much more certain that that gas was going to Canada. Whereas here, at certain times of year, it may go to the Don Hub. It may well end up back in New York because the Don Hub sells into the United States and into Canada. But the town of Weymouth said, even knowing that 52% of that gas was slated for export, that that doesn't go against finding the pipeline. Let's suppose because it's a judgment that we're not bound by that that doesn't exist. What else have you got? Besides town of Weymouth, I think, I mean, the reasoning of town of Weymouth, that exporting to Canada is not contrary to the public interest, and the commission is focusing, as it did in the paragraph 45 of the rehearing order, on the domestic benefits and the potential domestic consumption of gas. But the commission just doesn't break it down to, say, the 260. I mean, even the 260 that's going to Canadian local distribution companies is coming from American producers. So I don't know. The commission doesn't analyze it that way. As I understand the way this works, when there is, in fact, an export, then there has to be a Section 3 certificate attached to that, right? I'm glad you asked that. There are two kinds of Section 3 authority, neither of which is implicated in this case. One is to build the facility that crosses the border. The facilities that cross the border that could be used in this case were certificated in 1989 and 2001. The DTE gas was certificated in the name of Michicon in 1989. Vector got its certificate, actually, to import in 1999 and then to export in 2001. So those are existing built facilities. They're not being built as a result of this order, and they have their authority. The shippers have title to the gas. So a shipper who wants to send their gas to the Don Hub has to get its own Section 3 authorization from the Department of Energy, not from FERC. So, for instance, I looked up, and Union Gas in September 2018 got authority to export up to 150,000. It specifically cited the gas that it would transport through the Nexus Pipeline, taking title at the Kensington Processing Plant in Columbiana County. So those Section 3 approvals for the facilities date back decades, and for the actual export are being obtained separately by the shippers themselves, not the pipeline. And they can't do it if they don't have that authority. All right, but the application here in the order has, what, four separate parts. There's the construction, but then there's the leasing. Right. Yeah, but the issues in this case all center on the construction, the eminent domain, and so on. I understand that, but if the reason for the construction and the firm commitments is because of the export to Canada, that's a different scenario. Well, first of all, the Commission didn't accept that that was the case. The Commission was looking at the service to domestic markets in Ohio and Michigan, and it was looking at the, not only firm delivery points, but secondary delivery points. Like a shipper who has authority and may often, or at some point, ship its gas to the Don Hub, may well, sometimes a year, find that it would rather sell it in Michigan or in Ohio. And the pipeline is designed to be that way. And there are a lot of pipelines like this that might be several hundred miles long across U.S. states. But because the whole pipeline grid is interconnected, I mean, Vector doesn't export gas to Canada just for Nexus. It does it for Rover. It does it for Vector's own pipeline. It does it for other pipelines coming into Michigan. So that's why the Commission says when you're constructing at the border, that's section three. So do you think that the Commission could approve a pipeline where 100% of the subscription, precedent subscription agreements say that the gas is definitely going to Canada? All of it? I don't think it's ever seen a case like that. And because of the Commission's emphasis on flexible delivery points, I don't know what it would make of that circumstance. I do know there are some pipelines that are associated with LNG. Would that be consistent with section seven? I think the Commission might find that it is. I know that some of the pipelines that are connected to LNG terminals are treated under section seven and not under section three. So what work does section three do there? You say it's irrelevant? Section three applies to LNG terminals, obviously, and to pipeline that crosses the border, but not necessarily other pipelines that interconnect with that. So someone could say we are going to export 100% of this gas from the Marcellus Shale overseas, and we're going to take property of U.S. citizens in order to construct that pipeline, and that's consistent with section seven and consistent with the Constitution? No, I think the Commission would require the pipeline to make a showing of domestic. I think that from what I've seen, we haven't had that case, but the Commission would, as I said, the Commission doesn't focus on the potential export part of this. It rejects what it calls the mistaken assumption that this is not for domestic consumption, and everything the Commission focuses on in these orders is the domestic piece, the markets in Ohio and Michigan and the flexible delivery points along that line. So I don't know what the Commission would do, but I think it would have a different analysis than in this case if it were actually presented with a case that explicitly didn't have domestic consumption in mind, but that's not this pipeline. Are you familiar with the Driftwood case decided by the Commission on April 18th of this year? No. My understanding is that it involved a pipeline where it was 100% subscribed for export. I'm not familiar with that, no. But I would assume the Commission did a different analysis of that than it did in this case. Well, I guess my point is that it seems concerning to me that the Commission didn't really spell out what weight and how that affected the analysis under the given statutes, given that there was a significant percentage of the capacity that was the basis for the need finding that was destined for export. Why shouldn't that be troubling to us, that we don't really have an analysis from the Commission? Well, I think that the Commission only, in its analysis, I think only took the 260 going to the Canadian local distribution companies as known that it would, even those I think they could sell into the United States in the seasons that they don't need them. The Commission, I don't even know what the Commission said in the case underlying the Town of Weymouth decision, but as I said, in that case it was clear that 52% of the gas was likely going to Canada. But the Commission didn't accept that as the premise here, given seasonal flows and seasonal differences between when Canada might need more gas and when Ohio and Michigan may need more gas. So I think that the Commission was looking at the benefits to the domestic markets. And as I said, the infrastructure in this area, the pipeline grid, this pipeline was designed so that it can also connect up with other pipelines going farther west to reach Chicago markets, or I should say Illinois markets. So that was all in the mix. So the Commission wasn't looking at this as necessarily being substantially for export. It was looking at the domestic aspects of it. All right. Thank you. All right. Counsel for intervener. Good morning. David Super on behalf of Nexus. Touching on a point that you made, Judge Srinivasan, when the Commission relied upon the 59% level of subscriptions, it did contemplate that that percentage would be growing, and it has grown since then. The number is actually up to 71% as of April of this year. That's something the Court could take judicial notice of. It's provided on our website by Nexus as required by FERC. I'm sorry? How is that? Well, the Commission requires Nexus to keep that information, make it available to the public via website, and that website lists all the contracts that are applicable today. And, again, right now the level of subscription capacity is 71%. How many of those subsequent agreements are for export? Well, there really are none that are for export. I think that's a misconception that while even a shipper such as EAB Ohio or Chesapeake that has firm delivery rights to the border, that's not to say that that gas will actually end up in Canada. It has rights all along the entire pipeline, and that is sort of the whole point of the restructuring of the natural gas pipeline grid that FERC enacted in Order 636. It's to allow shippers to have access to all points along the entire route. And, in fact, for a shipper like EAB Ohio that does have firm delivery rights to the Don Hub, FERC has recognized that the Don Hub is a very liquid trading market, so some percentage of that gas that ends up at Don Hub could very well make it back into the United States, back in interstate commerce. I mean, you know what's happening on the ground, but I thought part of the point was the demand in the United States was decreasing for some of this natural gas, and Canada was an attractive market given the shift to some of the renewables. So this notion that, well, maybe some of this gas will get to Canada, I mean, that just seems to me like we're talking about a fake world. Well, actually, Your Honor, again, on a public website that's available to anyone, we can actually see how much gas did end up in Canada from the Nexus pipeline. As of April, it was 25 percent, so the rest of it was flowing through pipes in the United States in interstate commerce. So that's 25 percent as of? That was April of 2019. Twenty-six percent was making it to the Don Hub, and of that 26 percent, the way the market is designed to work and the way that FERC restructured the market to work, some percentage of that gas is going to end up back in the United States, just given the volatility of the trading hub that is the Don Market. Is it not true that, conversely, that of the 75 percent, some of that won't end up going somewhere else, too? The 75 percent is in the United States. And it stays in the United States. Its endpoint is the United States. That's one of the challenges of this. You really can't know where gas is going to end up at the time. You have to look back and see where it ended up. But as of April, 76 percent or 74 percent of the gas was in the United States, being delivered to points in Ohio and Michigan. Seventy-four percent of it went to the Don Hub. But I'm back in the real world. Investment decisions are made all the time, projecting where the gas is going to go. You're right, Your Honor. All right, so this notion that we don't know where this gas is going, I mean, counsel, you know a lot more about this, obviously, but we can't ignore some basic facts, and FERC isn't denying those facts either. That is true, Your Honor. It's acknowledging that this gas is going to do some things domestically, but also it doesn't know where a large percentage is going, it says, but it doesn't deny that it could all end up in Canada. Very, very unlikely that it would all end up in Canada. Here we've got three shippers. Well, I mean, our client had the opportunity to put in evidence to show that it wouldn't, and it didn't. Well, it actually did, Your Honor, respectfully. Where is that evidence? Well, it presented precedent agreements that have delivery points throughout the entire line. But that's the 59%. I'm talking about the rest, where FERC made no findings. The rest being the remaining 41%. Okay, and that's where you actually, I think there's a misconception about whether there actually was a finding of increased demand in the record. FERC absolutely found that there was a growth in demand by looking at market studies. Wait, can I just ask a point of clarification? I thought that the 41% wouldn't have any idea because it's not committed. So we're only talking about the 59% to begin with, and we're talking about how that 59% is allocated. That is correct. That is correct. And today it's 71%. Right. Well, put that aside. Let's stay in the 59% world. Okay. With the 51%, it's not committed. That is true. The 59% is committed. That is true. The issue is that of that 59%, at least some of it predictably is going to go to Canada. We might not know exactly how much, but it seems like everybody is on a common understanding that at least some of it is, and it's not an insignificant share. There is an expectation that some of that gas could end up in Canada if those shippers utilized their primary delivery points. They could utilize secondary delivery points. If the market in Canada is not the best market for that gas. For example, the Canadian utilities have to contract for enough gas and enough capacity to serve their peak demand day. If it turns out that they don't need that gas for peak demand days, they can move that gas to other attractive markets, or they can release that capacity to other shippers who can then move that gas to a more attractive market. That sense of allocative efficiency is exactly what FERC was trying to capture when it restructured the grid in Order 636, which was court-accepted. Right, but that had a lot to do with unbundling, etc. What I want to be clear about, and I don't disagree with what my colleague just said, but heretofore, I thought, FERC had gone along by saying most of the capacity has been committed. We don't have that here. So all we have is 59%, and the focus is we've been chatting about what happens to the 59%. My only point is that there's this other capacity that may not be committed right now, but it just would boggle the mind that investments are being made with the idea that 41% is not going to be used, and where the attractive market is there for natural gas in Canada, the question is sort of, you know, is the tail wagging the dog? Your Honor, I think there's an error built into that question. This notion that the attractive market is in Canada, that in fact runs counter to the market reports that the Commission relied upon in approving this project. It didn't stop at 59% subscriptions. It then went to look at other evidence that supported public need. There was an Ohio market study that showed a need for gas in the future in the northern Ohio markets. There was a Michigan Public Service Commission study that found the same thing for Michigan. So this notion that there's not a demand for natural gas in the upper Midwest is simply incorrect. The Commission relied upon studies that showed the demand for gas in Ohio and Michigan, and the Commission is the agency with the discretion and the expertise to weigh these studies and come to a conclusion. There are studies pointing elsewhere, but the Commission said we're not going to accept those for purposes of the 59%. What I'm concerned about, what's a little discomforting here, is the uncommitted. What's going to happen there? Well, the Commission found that there's a growing demand for gas in Ohio and Michigan. There's an oversupply coming out of New York. But it was focusing on the 59% to show that that contrary to Petitioner's argument wasn't really for export to Canada because there was this need, and the studies that the Commission credited showed that. And it's just this elephant in the room. I think the studies also, Your Honor, show that there's a demand for the 41%. That's the key. I didn't see that in the Commission's decision or the rehearing order, but maybe it's there. If you look at Joint Appendix 1222, the Commission is talking about being unpersuaded by the studies by Sierra Club and the City of Oberlin. As to what, the 59%? No, that's for the further capacity. What paragraph are you in? That's 34? I actually do not have that written down. Well, that's 1222. Right. All right. Well, the Commission relied upon the Ohio market study in the rehearing order at Joint Appendix 1220 and 1221. But you represented here this morning, Counselor, just so I'm clear, that nobody knows what's going to happen to the 41%. So when you submitted these studies to FERC on which FERC relied, it was focusing on petitioners' challenge that this was really what it calls an export pipeline. And your studies, which the Commission accepted, said, no, there's this demand. That's correct. All right? It wasn't addressing the 41%. That's all I'm getting at. I respectfully think they were addressing the 41%. All right. I mean, the Commission, a big part of the Commission's decision here was not just looking at the current 59%, now 71% subscriptions. They were looking at a growth in demand in Ohio and Michigan, and they cited three studies that supported that. In addition, they relied upon the fact that the Marcellus and Utica regions were producing a lot of gas and there was insufficient infrastructure to move that gas. So there was ample studies beyond the 59% subscription level that supported the public need for this project. It would take me a little time. The studies on the other side, the Commission either addressed them and rejected them, found that the methodology was flawed, and that's in the record, or, for example, the two FERC market reports that the petitioners rely upon entirely support the project. I mean, there's one where they talk about a limited amount, or there's one where they're talking about 49 BCF per day of pipeline projects that are pending as of March of 2016. The very next line in that report and then the carryover to the next page says, and in order to have enough shipping to carry that capacity, we need these projects to be approved, and the Nexus project was one of the projects in line waiting to be approved. You're more familiar with these studies, but what I was focusing on in paragraph 34 is the Commission's statement where it says, given this uncertainty associated with long-term demand projections where an applicant has precedent agreements for long-term firm service, the Commission deems the precedent agreements to be the better evidence of demand. So I read that to be that's what the 59% is what the Commission's focusing on, and maybe I just misunderstood the study. Now, I think the Commission absolutely focused on the 59% subscriptions, but it didn't stop there. It also discussed the market studies. It also discussed input by other interested parties. I mean, it relied upon the fact that there was not enough infrastructure in the Marcellus region to move the gas. It relied upon the fact that enhancing the pipeline grid in general would allow various Midwestern markets, most significantly the Chicago hub, to access additional supplies of gas. So there was a robust gathering of evidence that the Commission did rely upon to support public need in addition to the 59% subscriptions. What should happen if the Commission is faced with an application for a certificate where the precedent agreements are 100% for export? Respectfully, I have to just, in terms of that question, there really is no such thing as a precedent agreement where the gas is 100% totally for export. I mean, that just doesn't exist. At least in this case it doesn't exist, and I'm not aware of such an animal. Here we've got contracts where certain shippers, yes, do have primary delivery points that could take their gas to the border. Let's suppose then, you know, you want to change my hypothetical, I'll accept your friendly amendment. Okay. So 100% say their primary destination is Canada. Okay. So in that situation, one could not know whether gas will end up in Canada or what amount of gas will end up in Canada until after the fact. When you look at the facts on the ground, with delivery points throughout the entire line, some substantial portion of that gas will end up in the United States. But if the question is directed to whether it should be governed by Section 3 or Section 7, which I understand we've been talking about before, in this situation you've got a pipeline that's gathering gas that is produced in Ohio, Pennsylvania, and West Virginia, and it is shipping that gas to points in Ohio and Michigan, albeit some of that gas through various contracts can make its way to the border. But that structure, by definition, is interstate commerce, and thus it's governed by Section 7. I want you to answer my hypothetical, which is that there are precedent agreements for 100% of capacity, and they are written to say that the primary distribution point ultimately for that gas is the Dawn Hub. Okay. Your Honor, I'm not aware of a case like that. I'm going to take a shot at it. I think it's a policy issue, but my answer would be, if that gas is being gathered in Ohio, West Virginia, and Pennsylvania, and there are delivery points in Michigan and Ohio, even if each of the contracts calls for a primary delivery that would take the gas to the border, that's interstate commerce. That's governed by Section 7. How is that consistent with border pipeline? Because, Your Honor, border pipeline involved a pipeline that was entirely within the state of Texas. Thus, there was no possibility to assert the applicability of Section 7. There simply was no interstate commerce in that case. And so it really is distinguishable. I mean, the question was whether— It's distinguishable, but our reasoning, I mean, we have language in there that notwithstanding the interstate commerce aspect of this, talked about what is foreign commerce and what is interstate commerce. I understand. If you have interstate commerce, as Maryland v. Louisiana said, once the molecules are in interstate commerce, they stay in interstate commerce throughout their entire path. I think the analogy to border would work as if, say, the Nexus Greenfield Pipeline began in Michigan and terminated in Michigan, and that it led to a border crossing owned by Vector Pipeline. Then at least you'd be talking about a pipeline that was truly an intrastate pipeline, and you'd have an interesting question about whether Section 3 could apply to that intrastate pipeline. But here, because the pipeline originates in Ohio and crosses into Michigan after gathering gas in Ohio, Pennsylvania, and West Virginia, you've got interstate commerce. And that is a point—I don't think there's any way around that. It is simply interstate commerce. All right, anything further? Not unless the panel has further questions. Thank you. Thank you for your assistance. All right, counsel for petitioners? A few points, Your Honor. Our brief at page 25 to 28 discusses the whole issue of the market needs studies. With regard to the contracts, it's very ironic that the Commission now insists that these contracts have no destination points, everything is fungible, because the Commission rejected alternatives to the project because the gas wouldn't be delivered to the points specified in the precedent agreements. So you can't say that the precedent agreements matter in terms of where the gas is going to go when you're looking at the siting, and then say, oh, it doesn't matter, we have no idea for this Section 7 versus Section 3 analysis. That's just arbitrary decision-making. In terms of whether eminent domain was voluntarily acquired here, my co-counsel represented at least 20 clients who had to negotiate agreements with a proverbial gun to their head, and he's just one attorney representing a small portion of landowners along this pipeline where things were voluntarily agreed to. And the point about the city of Weymouth, what the court said in Weymouth was petitioners have not identified why granting the certificate in this case would not still advance the public convenience and necessity even if the portion of the gas is diverted for export. Well, the petitioners in this case have identified a reason, and the reason is that if you use export as a basis for public convenience and necessity when you have eminent domain, you have a problem because export is not necessarily a public use, nor has eminent domain been conferred on pipelines for export under Section 3. Well, when I was discussing with counsel for intervener Paragraph 34, this is in the hearing order, didn't the commission pretty much respond in Paragraph 35 and 36 rejecting basically petitioners' argument here, pointing out the importance to the grid, the demand, and it was aware that, as it says, nexus continues to market the unsubscribed capacity. So, I mean, the commission was aware of what I'll call your worst-case scenario, but nevertheless went ahead even though it was only 59 percent at the time. So, as to those points, first, the commission's findings are belied by the facts, the fact that nexus had been marketing this project for seven years before it came before the commission. The commission also fails to reference that there were 11 TTAPs that were originally part of the original project that aren't being used, and also that there's, like, extra 30,000 horsepower of compressor stations that are being built unnecessarily. What the commission also doesn't mention is the other thing that's driving this, besides building a pipeline on spec to serve export needs, is this 14 percent return on equity that sweetens the pot. This court in Appalachian Voices affirmed a 14 percent return on equity for a fully-subscribed pipeline. Here, that same cookie-cutter 14 percent is being used to justify a partially-subscribed pipeline, and the commission, the reasoning is the same in both, and that's irrational decision-making, too. So that's just another factor that's kind of lurking beneath the surface that's also driving some of these decisions. And the last point, with regard to the eminent domain, the commission very summarily, in footnote 116, dismissed the arguments, as in paragraph 46 of the rehearing order. It basically said, we've addressed these eminent domain challenges. It cites a couple of cases that, again, fully-subscribed pipelines, no challenges related to export. Citing the Tennessee gas versus Thatcher case, that was the first challenge to the use of eminent domain under the Natural Gas Act, where the court said, well, yes, of course this is a public use, because the gas is being used for ultimate consumption to the public. It didn't address export, and it didn't even address the types of scenarios we have in today's environment, where the gas is going all over the place. You don't even know if it's going to be used for consumption. So the commission, again, that finding is subject to de novo review anyway, but it would have to be subject to some kind of review, because there's no decision there. Our arguments were summarily dismissed without any analysis or any attempt to even show how those cases related to the facts of this case. And we would ask this court to vacate the certificate and find that this pipeline results in unconstitutional taking of property. Thank you. Thank you. We'll take the case under advisement.
judges: Rogers, Srinivasan, Wilkins